CORDRAY v. MORGAN.

No. 1992, Okla. T.    Opinion Filed May 14, 1908.    Rehearing Denied.

May 10, 1909.

(95 Pac. 761.)

1.    HOMESTEAD — Title in Husband — Law of 1905. Under the law as it existed in the territory of Oklahoma prior to the passage of the act of March 15, 1905 (Sess. Laws 1905, p. 255, c. 18), the title or ownership to the property used by the family as a home to acquire the status of a homestead was required to be in the husband, as he was declared to be the head of the family. If it was in the wife, it was not a homestead, though occupied by the family.

2.    SAME — Title in Wife — Conveyance by Wife—Abandonment. Where in 1901 the husband by quitclaim deed conveyed the homestead to his wife and abandoned her in 1902, and the wife and children shortly removed from the land, which was thereafter occupied by tenants, his sole occupancy of the land during 1905 and prior to March 28th of that year would not impress it with the homestead character, or re-establish in him any such interest as would render it necessary to convey that he join in his wife's deed executed after the passage of the act of March 15, 1905 (Laws 1905, p. 255, c. 18), above referred to, which reserved the homestead to the use of the family without reference to whether the title or ownership was in the husband or wife.

(Syllabus by the Court.)

*Error from District Court, Canadian County; before C. F. Irwin, Judge.*

Action by J. W. Cordray against H. W. Morgan. Judgment for defendant, and plaintiff brings error. Affirmed.

This was a suit brought in the district court of Canadian county by John W. Cordray against H. W. Morgan for the purpose of quieting title in plaintiff to the northwest quarter of section 15, township 11, range 8 W., a tract of land situated in that county. The facts out of which the controversy grows are substantially as follows:

Plaintiff secured title to this tract of land as a homestead from the government, and occupied it with his wife as the home of the family to July, 1902. In the month of May, 1901, he executed and delivered to his wife, and had the same entered of record, a quitclaim deed to the land. A consideration of $400 was expressed therein, but this was the amount of the mortgage on the land she assumed and agreed to pay. This was the only consideration. A year from the following July, in order to avoid trouble which he was having, he left Canadian county, going to California, where he remained until February, 1903, when he induced his wife to visit him in the city of South McAlester, Ind. T., at the home of her sister, and in whose care she had placed their children in September, 1902. After plaintiff left in July, 1902, his wife the following September sold the personal property on the farm, applying the proceeds to the payment of plaintiff's debts, approximating $2,000, rented the land to a tenant by the name of Hill, and afterwards by a written lease, dated November 7, 1904, rented the premises to one S. G. Bradley, the term of said lease being from the 1st day of September, 1904, to the 1st day of September, 1905, and Bradley went into possession of the farm under this lease. During the term of plaintiff's absence he returned on one or two occasions for an interval of a few days, when he visited the farm occupied by the tenants of his wife, though he also claimed them as his own. November 12, 1902, his wife instituted a suit for divorce against him, which was granted by the district court of Canadian county February 23, 1903. After leaving the farm Mrs.

Cordray went out to service for the purpose of earning money to maintain herself and the children. · Plaintiff returned to the place in January or February, 1905, found in possession the tenant Bradley, and some time prior to, or on or about March 28, 1905, Bradley removed from the land and plaintiff occupied it. We have been referred by counsel to the case of *Cordray v. Cordray*, 19 Okla., 36, 91 Pac. 781, which shows that service was secured on plaintiff by publication, and that the cause was tried and judgment rendered in the district court of Canadian county on February 23, 1903; that on the 25th day of April, 1905, the plaintiff in this case appeared in the district court of Canadian county and filed his motion to vacate the judgment and decree of the court for the reason that the court was without jurisdiction of the person of defendant because of defects in the service. The district court overruled the motion, but on appeal the Supreme Court reversed it, and held the judgment granting a divorce void for want of jurisdiction over the defendant in that case. After the divorce was granted, and in September, 1903, Mrs. Cordray was married to a man by the name of Hand, moving to and living with him in Caddo county. On the 28th day of March, 1905, Mrs. Cordray, as May Hand, gave a warranty deed to the tract of land above described to the defendant, H. W. Morgan, receiving from him in consideration thereof $200 cash and notes, making a total consideration of $4,000. Thereafter, and on the same day, he procured a team, drove to the farm which up to that time he had known by reputation only, and found plaintiff there on the place in possession.

On the trial of this cause plaintiff introduced a paper purporting to be an instrument establishing in his wife a trust of the land for her benefit and that of himself and children. This instrument is as follows:

"May 28, 1901. El Reno, Oklahoma Territory, Canadian County. Contract between John Wesley Cordray, the first part, Salie May Cordray, the second part. John Wesley Cordray, the first part agrees to dead to the second part the northwest quarter,

section fifteen, town eleven, range eight, without no consideration whatever except four hundred dollars morge on the west eighty acres which we both agreed to and spint the best we knew how. The first part also agrees to not sell or offer the farm for sale. The second party agrees to hold the northwest quarter of fifteen T. leven, R. eight for a home for John Wesley Cordray and Salie May Cordray and Ino May Cordray and Birtha ———— Cordray, and never offer scd land fer sale and also agrees .to lisen no more what Lizzie Thomas ses to you and also agress to rint the farm and go west until further changes takes place here, the second part also agrees if any change be made whatever, the northwest quarter fifteen T. leben, Range eight shall fall back to John Wesley Cordray and Ina May Cordray, and Birtha ———— Cordray, the second part also agrees that there was no consideration paid on the land whatever, except four hundred dollars morge on the west eighty acres. John Wesley Cordray.

                    her

"[Seal.]   Salia X Cordray.   [Seal.]   Witness:

                    mark.

"F. L. Bonham.   Ben Hudson."

Plaintiff and Ben Hudson both testified to the execution of this instrument. The testimony of Mrs. Cordray in reference to the reason the deed to the farm had been made to her by her husband was as follows: "He gave it to me for mine and their [the children's] support. When he left he said he never intended to return to this country. He never aimed to come back." That she sold the personal property, including the household furniture, on the place, and went to work by the week to support the family. That plaintiff sent some money to the children, who were with her sister, but not enough to support them. That she paid the interest on the mortgage, and had paid the taxes on the place and supported herself and the children during all the time of plaintiff's absence. In reference to the trust instrument and the evidence given by her husband and the witness Ben Hudson she testified as follows:

"Q. Will you examine that, Mrs. Hand, and state if you ever signed any such instrument as that? A. No, sir; never saw that

before until to-day. Q. Is that your signature? A. It is not. Q. You heard the testimony of Ben Hudson this morning? A. Yes. Q. Heard the testimony he give in reference to your stopping at his house with Mr. Cordray and signing this? A. Yes, sir. Q. Did you stop at his house that day? A. No, sir; and we did not go within three miles of Mr. Hudson's place. Q. Do you remember the time you came to town? A. Yes; we came to town about 8 o'clock that morning, and believe we got back about 7 o'clock. It was not dark yet. I believe it was between 6 and 7. Q. Ask you to state whether or not you was ever up there that day? A. No, sir; never was. Q. Were you there that day? A. No, sir. Q. Were you there any other day when this instrument was produced? A. No, sir; it was never mentioned, and I did not know that Mr. Hudson knew that I had a deed to the place until to-day."

The testimony of the wife and her sister both were to the effect that at the time plaintiff was at South McAlester in February, 1903, he said that he was glad that he had deeded her the place, and that if he had another one he would deed it to her for support of herself and children, and that he never intimated that he laid any claim whatever to the place or expected to return to it. In the several letters written by plaintiff, which appeared in the record, he nowhere mentions any claim which he made upon the land or in the land, although in one of them dated February 11, 1903, he states that his wife told him that she was suing him for divorce. This information being given him at the time his wife visited him at his instance at South McAlester, still it is not shown that he took any steps to protect any interest he still claimed in the land, nor is it shown that he asserted he had any.

When Morgan went to the place he testifies he first heard of the alleged contract. Cordray then told him of his claim to the land under it, stating that the same was with his papers with Judge Lowe, and giving Morgan permission to call there and inspect it. He told Morgan that his wife had no right to convey it or sell it. Morgan called on Judge Lowe, who was counsel for Cordray, but did not see the contract, and Judge Lowe testified that he did not have it at that time, stating that Morgan asked

to see the divorce papers and did not ask him for the contract. Morgan further testified that before purchasing the land he made a very careful inspection of the records at the recorder's office and ascertained that the title was in his grantor; that he never heard of any terms or agreement between Mrs. Cordray and her husband until the afternoon after the trade was made.

As the character of the connection of Cordray with the land after his return in January or February, 1905, will be material in determining the question of whether he had in fact any interest in the land at the time of its conveyance by his wife we will notice it. The trial of this case took place on the 13th day of March, 1906. Cordray testified:

"Q. You were in possession, were you, on the 28th day of April last year? A. Yes, sir. Q. How long had you been in possession before that? A. In January when I started to live there. I was back there in August, 1904."

Witness Richardson testified:

"Q. Do you know where he (Cordray) lived in April, May, and June last year? A. 1905? Q. Yes. A. Yes, sir; he was living on his place. Q. This land in question? A. Yes, made that his home. Q. How long had he been living there? A. I met him on the morning of the 11th of February, and he said he came from the place, was living there then, and was going to move there, and he went with me to Minco that day, and a few days afterwards I seen him there in the neighborhood again. Q. He was farming the place last year? A. He farmed part of it, and he worked with me some, and he was back to the place from time to time."

Witness Erbar testified:

"Q. Who has had possession of that place for the last two years, if you know? A. The last year Mr. Cordray has had possession of it. Q. And when did he have possession? A. If I am not mistaken, it was the 10th or 17th of February. I know it was awful cold when I first seen him."

The testimony of his former wife in reference to the occupancy of the land by her husband is as follows:

"Q. You knew your husband was at home on the farm when you made this deed to him, did you not? A. No, sir; I had been

to the place about two weeks before I made the deed. Mr. Cordray was there, and I had rented the place to Mr. Bradley, and Mr. Cordray was there all dressed up and his hands in his pocket. Q. Did you make any inquiry whether he was there for any length of time or had been? A. No sir; I didn't make any inquiry."

The defendant, Morgan, testified:

"When I went to the place, and found Mr. Cordray there claiming title to it of some kind, I came back and informed Mrs. Hand of the fact, and we agreed to let the matter rest until the title to the land was quieted."

There is no evidence to contradict this or to show that any of his family at any time after his return occupied the place with him, or that it was used by the family as a homestead. Morgan also testified that when he found Cordray there Cordray told him that he owned the place, and that it belonged to him, "and I told him that I would like to know how it belonged to him, and he said he got it in the opening and had a patent to it. I said: 'I understand that you got it in the run; but I see you have conveyed it to Mrs. Cordray when she was your wife, is not that true?' He then said, 'Yes,' and I said, 'Where does your title come in?' and he said, 'Well, the deed was that she was to keep the place and never deed it away,' or words to that effect."

Upon these facts the district court rendered a general judgment in favor of Morgan, the defendant, and against Cordray, and the cause is before us on proceedings in error.

*Joseph G. Lowe* and *J. J. Carney,* for plaintiff in error.
*Glitsch, Morgan & Glitsch,* for defendant in error.

DUNN, J. (after stating the facts as above). Under the complicated relationship which has grown up between all the parties interested in this litigation, and in view of the conflicting and irreconcilable evidence given upon some of the material points involved, no decision which could be rendered by any court could be entirely satisfactory to it. It is one of the inherent limitations upon even the extended, far-reaching powers of a court that with

all the aid skillful counsel can yield it, and after it has exercised its utmost ingenuity to ascertain the truth in a case of this character, there may still inherently lurk the suspicion that, notwithstanding the rules of evidence and law are all observed and vincated, it is yet possible for the judgment to be incorrect. The time-honored haven into which appellate courts drift on disputed facts is in recognition of the rule so frequently enunciated, "that the trial court, having heard the testimony, seen the witnesses, and had the opportunity of determining, from their appearance and deportment and manner of giving their testimony upon the witness stand, who should be believed, and who should not be believed, and the evidence reasonably tending to support the conclusion of the court, its finding will not be disturbed here." (*Jenks v. McGowan,* 9 Okla. 306, 60 Pac. 239.) And in fact we are not able to say, after reading the record, that the trial court did not decide correctly; for unquestionably it had advantages superior to ours for learning the real truth, as it had before it the living witnesses, whom it could view face to face, while the record before us presents the evidence of the frank, honest witness with no greater clearness than it does that of the halting, shifty one, whose manner of delivering his statements clearly manifests the evasion or the falsehood practiced. The judgment of the court rendered was general in favor of defendant and against the plaintiff, and, like the verdict of a jury, will draw to it for its support, not only all of the things which are directly testified to and established by the evidence, but also all the logical deductions and inferences which may be properly drawn therefrom.

Our duty is to apply the law accordingly, and the initial proposition presenting itself in the case is, what, in fact, was Cordray's legal or equitable interest in the land? Did he in fact have any at the time the deed was made by his wife to Morgan? If he had no interest, then it will not be necessary for us to notice many of the questions which are raised and argued in the briefs of the parties. In the oral argument of counsel before the court the changed situation, brought about by the action of the Supreme Court in

the divorce suit above mentioned, was presented and issue joined, and it became necessary to consider it in determining this question.

On February 23, 1903, Mrs. Cordray was granted what she and all parties doubtless believed was a valid divorce. Acting upon this, she was married the following September to a man by the name of Hand. Cordray returned to Oklahoma in the first part of the year 1905, and in April began proceedings to have the judgment of divorce set aside. The district court denied his application, and the matter was pending in the Supreme Court at the time of the trial of this case in the district court in March, 1906. The Supreme Court, after the trial of the case at bar, reversed the district court in the divorce case, set aside, annulled, and held void the judgment recovered by Mrs. Cordray in her divorce suit, which necessarily dissolved the relationship which had arisen between herself and Hand, and she was once more Mrs. Cordray as effectually as if no divorce suit had been filed. *Cordray v. Cordray*, 19 Okla. 36, 91 Pac. 781.

Wilson's Revised and Annotated Statutes of Oklahoma for 1903, § 2985, is as follows:

"The following property shall be reserved to the head of every family residing in the territory exempt from attachment or execution and every other species of forced sale for the payment of debts, except as hereinafter provided: The homestead of a family not in a town or city shall consist of not more than one hundred and sixty acres of land, which shall be in one tract or parcel with the improvements thereon. The homestead in a city, town or village, consisting of a lot or lots, not to exceed one acre with the improvements thereon; Provided, that the same shall be used for the purpose of a home for the family."

Section 3140 of Wilson's Revised and Annotated Statutes of Oklahoma for 1903 provides:

"The husband is the head of the family. He may choose any reasonable place or mode of living and the wife must conform thereto."

Under these statutes the placing of the title and ownership to a tract of land on which the family lived and which was used by

them as their home in the wife at once deprived it of its homestead character, and rendered it subject, as all other property, to liens, forced sale, and the right of the wife to convey the same without the assent of her spouse. *McGinnis v. Wood,* 4 Okla. 499 47 Pac. 492. It was not a homestead in legal contemplation, notwithstanding the fact that it was occupied and used by the family as a home, for the reason that title to a homestead could be in the head of the family only, and the husband was the head of such family. This continued to be the law of the territory until March 15, 1905, when the Legislature amended the section, and provided that:

"The following property shall be reserved to every family residing in the territory, etc. First: the homestead of the family, which shall consist of the home of the family, whether the title to the same shall be lodged in or owned by the husband or wife." (Sess. Laws 1905, p. 255, c. 18.)

This, as will be seen, amended the law so that the wife, who was not the head of the family, might hold the title to the land on which the family resided, and it would still be a homestead. The deed to Morgan was made March 28, 1905, 13 days subsequent to the time when this law came into effect.

Section 880 of Wilson's Revised and Annotated Statutes of Oklahoma for 1903 provides:

"No deed, mortgage or contract relating to the homestead * * * shall be valid unless in writing and subscribed by both husband and wife, where both are living and not divorced except to the extent hereinafter provided."

Section 882 provides:

"Where the title to the homestead is in the wife and the husband voluntarily abandons her, or from any cause takes up his residence out of the territory for a period of one year, she may convey, mortgage or make any contract relating thereto without being joined therein by him."

As we have seen, prior to the passage of the act of March 15, 1905, the title to the homestead could not be in the wife. If the title to the home place was in the wife, it was not a homestead.

Now the question arises, construing the act of 1905 with the provisions of sections 880 and 882, and weighing in the terms of these statutes the undisputed facts shown in the record relating to the actions of Cordray, was it necessary at the time of the transfer from Mrs. Cordray to Morgan to have had the signature of the husband to this deed in order that a valid conveyance could be made? It is shown by undisputed testimony that in July, 1902, Cordray left the land and the territory for the purpose of avoiding trouble, stating, as his wife testifies, and it is not contradicted, that he never intended to return to it. His wife, relying on this statement, on his part, shortly sold the household goods and personal property on the farm, applied the proceeds to plaintiff's debts, placed her children with a relative, left the farm in the possession of tenants, and went to work at hotels and elsewhere to earn support for herself and her children. Cordray testified that he sent money to the party who had the children, to support them. His wife testified that she supported them, but nobody testifies that Cordray sent any money whatever to his wife, or that he aided her in any capacity. She told him, according to his letter, in the fore part of February, 1903, that she was suing him for divorce. He made no objections to this and no appearance, did not remonstrate with her, or endeavor to get her to go with him, or do anything to again create the relationship of a family between them, and, taking this testimony in conjunction with all the other evidence in the case, we come to the conclusion that his absence from his wife was an abandonment of her, and that under the provisions of section 882 she had a right to convey the land without his joinder in the deed.

The quitclaim deed made by Cordray to his wife was in substantial compliance with the provisions of the Oklahoma statute relating to the conveyance of real estate, and conveyed all the right, title, and interest that Cordray had in and to the land, and thereby completely divested it of its homestead character, and as it was never used as a homestead of the family after the passage of the act of March 15, 1905, and prior to the execution of the deed

to Morgan, Cordray had no interest in the land which rendered it necessary for him to join with his wife in a deed for the conveyance of the same. It must follow from this, then, that the transaction between his wife and Morgan was of no consequence to him nor was his possession of the land or the character of the deed by which his wife held it or the consideration received by her on its sale of any legal or equitable concern such as would give him a standing in court to require the annulment of Morgan's title. This being true, it will not be necessary to consider these propositions, although raised and argued in the briefs of the parties. Nor does the question of rescission enter into the matter, for, if Cordray was without interest, he has no standing to assail the contract or the arrangement made between his wife and her transferee. For the reasons assigned, we conclude, therefore, that the deed to defendant was valid and sufficient to convey the land without plaintiff joining therein.

The remaining question in the case is in reference to the judgment which was rendered by the trial court in giving defendant complete relief entitling him to the possession of the property. Plaintiff invoked the jurisdiction of a court of equity, and having done so, and if, having all parties before it, the court was authorized to grant and give complete relief, he is not in a position to complain of such action.

Finding no error in the judgment of the district court, the same is accordingly affirmed.

All the Justices concur.